Thomas O. Chimeba, J.
The issues raised in Matter of Concord Realty Co. v. City of New York, the second above-captioned article 78 proceeding have already been disposed of (see memorandum opinion decision, N. Y. L. J., Oct. 6, 1970, p. 19, col. 3).
In the first above-captioned article 78 proceeding, petitioner, Bozart Realty Corp., on behalf of itself and all other owners, managers and landlords of apartment buildings located in Bronx County, and who are members of the Bronx Realty Advisory Board, Inc., seek judgment, declaring respondents to he without jurisdiction in respect to their acts already done and threatened to he done, and that such acts are and will be unlawful and in violation of due process of law; seek an order staying and prohibiting the respondents, their agents and employees and “those persons acting in concert with the *56 Respondents ” from proceeding with such acts or threatening to proceed with such acts “or otherwise”, for an order declaring the acts of respondents or any of them, as having been done without the taking of lawful procedure and thereby enjoining the respondents or any of them, their agents, employees and “ those persons acting in concert with them ” to vacate and remove from the buildings or any part thereof of petitioner and members of its class, and, for an order declaring the determinations made by respondents or any of them with respect to the acts already done, proposed or threatened to be done, to have been arbitrary, capricious and an abuse of discretion.
Respondents contend that their acts and threatened acts and the implementing procedures employed by them as stipulated in the agreed statement of facts are valid and lawful exercises of the power vested in the City of New York, its Departments of Health and Rent and Housing Maintenance and its Housing and Development Administration — pursuant to Administrative Code of the City of New York (§ 564-16.0 et seq.) —to remedy conditions presenting immediate danger to the health and safety of tenants.
It is conceded on the record that petitioner does not challenge the constitutionality of the statutes which have been placed in focus here but does challenge the interpretation put upon those statutes by respondents and also challenges respondents’ right to do the specific things they are admittedly doing here.
The following is the agreed statement of facts:
1. The allegations contained within paragraph two, three and four of the petition are admitted as true. (These paragraphs identify the parties and specify their position in the proceedings [amply reflected in the caption].)
2. Respondents’ acts herein have purportedly been taken under the authority and powers granted to them in section 564-16.0 et seq. of the Administrative Code of the City of New York, known as the Emergency Repair Program, and resolution of the Board of Health dated January 29, 1965, as amended.
3. Respondents have sent telegrams to the owners of 350 buildings in the form of that sent to Concord Realty, 349 East 149th ‘Street, Bronx, New York.
a. The Emergency Repair Program has been invoked in 23 buildings as of the close of business September 23, 1970 by the respondents.
b. The said telegrams refer to the condition or conditions alleged to be emergency conditions found by the inspector at the time he made his visit to the said buildings.
*57 c. The one or more conditions stated to be emergency conditions and each of the said telegrams are:
i. Lack of hot water or,
ii. Garbage accumulation or,
iii. Lack of elevator service.
d. To the knowledge of respondents, no other notice of any condition in the building was given by the city to any of the owners to whom the said telegrams were sent, except for four buildings who had telephone calls.
e. If the owner receiving such telegram called the telephone numbers set forth therein, he was told by the individual purporting to act for the department that his building was on the city’s list for possible emergency repairs.
4. With respect to the inspectors visiting the building at which the emergency repair program has been invoked:
a. The said inspectors are employed by the Department of Rent and Housing Maintenance.
b. The inspectors made the visits based upon information given to the Department of Rent and Housing Maintenance through tenants’ complaints.
c. The said inspectors reported the “ emergency conditions ” which were then certified by the Commissioner of Health based upon such report.
d. At the time of the inspectors’ visits to the buildings at which the Emergency Repair Program was later invoked, they had access to the hot water and elevator facilities, whether by apartment, lobby or otherwise.
e. That after the inspector filed his report of “ emergency conditions,” one or two visits were made by the said inspector or some other inspector prior to the invoking of the Emergency Repair Program.
5. With respect to invoking of the. Emergency Repair Program:
a. The Emergency Repair Program was invoked after the telephone calls or telegrams were sent to the owners of such buildings as set forth in the superintendents’ lists submitted by the city.
b. In order to invoke the program, the city has retained the worker or workers on strike formerly employed at those premises to restore essential services.
c. The amount paid by the city to superintendents and porters where applicable, is the same as they previously were paid by the owner of the building in question plus $18 per week. On *58 the records of the city, they are listed as independent contractors.
d. According to the city, the employees are to ‘ ‘ maintain essential services in the building until the landlord resumes providing such service himself.”
e. At the time that the method of invoking the Emergency Repair Program, as above stated, was conceived, Commissioner Altman telephoned the president of Local 32-E, Building Service Employees Internatioinal Union, who stated that the union did not object to the hiring of the striking workers where emergency conditions were certified, but that the decision as to whether to return to work would be left to each individual worker upon whatever terms and conditions were agreed between the worker and the city.
f. After the program had been invoked, an inspector visited the buildings in question on one or two occasions at the most during each pay period (biweekly). He does not return to the said building otherwise unless there are tenant complaints.
6. Commissioner Altman stated to the New York Post on September 23, 1970 the following:
a. With respect to the method used in invoking the Emergency Repair Program, “ I don’t know when it has ever been done before. I don’t care. It is always right to protect people in a health emergency.”
•b. With respect to the hiring of striking workers: ‘ ‘ This is a health emergency and the union has approved.”
c. With respect to payment of the workers retained by the city, the New York Post on September 23, 1970 reported, without the city conceding the accuracy of the statement, that Altman said, “The same as City workers, every two weeks. We will pay them first out of Emergency Repair Program funds and then out of the October rents the tenants will remit to me. The money left will be forwarded to the landlord. ’ ’
Respondents contend that the stipulated acts complained of by petitioner were and are a valid and lawful exercise of the power vested in the City of New York and its departments — pursuant to chapter 22 of the Administrative Code of the City of New York (commonly referred to as the “Emergency Repair Program ”) and to a resolution of the Board of Health adopted January 25, 1965 as amended March 31, 1968 (copies of both attached to respondents’ answer marked Exhibit “ A ”).
We look first, therefore, to the portions of those immediately pertinent sections of chapter 22 and to the Board of Health Resolutions upon which respondents bottom their “ defense.” *59 “ § 564-15.0 Definition of nuisance.— The word 1 nuisance ’ shall be held to embrace public nuisance, as known at common law or in equity jurisprudence; ivhatever is dangerous to human life or detrimental to health ® * *. (Italics supplied.)
“ § 564 — 17.0 Nuisances; who is liable.— It is hereby declared to be the duty, of which there shall be a joint and several liability, of every owner, part owner, person interested, and every lessee, tenant and occupant of, or in * * room * * * apartment, building * * * in the city * * * and of every person who has undertaken to clean any place * * * to keep, place and preserve the same and every part * * * in such condition, and to conduct the same in such manner that it shall not be dangerous or prejudicial to life or health, subject to the health code and orders of the department.” (Italics supplied.)
‘1 § 564 — 18.0 Dangerous buildings, places and things; declaration as a nuisance.— Whenever any building * * * in the city, in the opinion of the board, [Department of Health, previously the Board of Health] whether as a whole or any particular, shall be in a condition or in effect dangerous to life or health * * * the board may take and file among its records what it shall regard as sufficient proof to authorise its declaration that the same, to the extent it may specify, is * * * dangerous to life or health-, and may thereupon enter the same in its records as a nuisance, and order the same to be removed, abated, suspended, altered, or otherwise improved # * * as such order shall specify * * (Italics supplied.)
“ § 564 — 19.0 Stay of execution; modification.— If any party, within three days of service or attempted service of such order upon him and before its execution is commenced shall apply to the board, or the chairman thereof, to have such order or its execution stayed or modified, it shall then be the duty of the board to temporarily suspend or modify it at the execution thereof, save in cases of imminent peril to the public health, when the board may exercise extraordinary powers, as specified in section five hundred sixty-three of the charter and to give such party or parties together, as the case in the opinion of such board may require, a reasonable and fair opportunity to be heard before it and to present facts and proofs, according to its rules and directions, against such declaration and the execution of such order, or in favor of its modification, according to the regulation of the board * * (Italics supplied.)
“ § 564 — 20.0 Execution.- — If such order is not complied with, or so far complied with as the board may regard as reasonable, within five days after service or attempted service or within any *60 shorter time, which, in case of imminent peril to the public health, the board may have designated, or is not thereafter speedily and fully executed, then such order may be executed as any of the orders of the board or department. Any agency of the city is authorized to act as agent of the department in executing such order * * (Italics supplied.)
“ § 564-21.0 Substituted service; posting; service by publication.— [a and b provide for substituted service when personal service cannot be made]. c. Whenever the board shall have declared any condition, matter or thing to be a nuisance * * * and has entered the same in its records as a nuisance, the board may also take and file among its records what it shall regard as sufficient proof to authorize a declaration that such nuisance is widespread throughout the city or in any area thereof, and that personal service or service pursuant to subdivisions a or b of this section of an order or orders requiring the abatement, removal or correction of such nuisance would result in delay prejudicial to the public health, welfare or safety, and upon the filing of such proof and the making of such declaration, the board may order that such nuisance be removed, abated or corrected, as prescribed by the board, by order addressed generally, without specification of names or addresses, to all persons who, pursuant to the provisions of this chapter, have any duty or liability in relation to any such nuisance which may exist upon or in any real * * * property located within the area or areas specified in such order. Such order may be served by publishing the same for a period of not less than three days in the City Record and in a newspaper circulated in the area or areas mentioned in such order. Service of such order shall be complete at the expiration of the third day of such publication and such publication shall be sufficient notice of such order and of the nuisance therein mentioned to all persons having any duty or liability in relation thereto under the provisions of this chapter.” (Italics supplied.)
“ § 564-22.0 On what expenses to be a lien.— The expenses attending the execution of any and all orders duly made by the department shall respectively be a several and joint personal charge against each of the owners or part owners and each of the lessees and occupants of the building * * * property * * * to which such order relates, and in respect to which such expenses were incurred,; and also against every person or body who was by law or contract bound to do that in regard to such * * * property * * * which such order requires. Such expenses shall also be a lien on all rent and compensation due, or to grow due, for the use of any * * * building, *61 premises * * * to which such order relates, and in respect of which such expenses were incurred * ™ (Italics supplied.)
“ § 564-27.0 Service of order or judgment.” [Provides for service of various papers upon persons owing, or who are about to owe any rent or compensation for the use and occupation of any buildings or any part thereof to which such order or judgment relates.]
So much of section 563 of the New York City Charter (see § 564AL9.0) immediately pertinent to this controversy, reads as follows: “ § 563. Declaration of imminent peril. — In the presence of great and imminent peril to the public health, it shall be the duty of the board of health, having first taken and filed among its records what it shall regard as sufficient proof to authorise its declaration of such peril, and having duly entered the same in its records, to take such measures, and to order the department to do such acts beyond those duly provided for the preservation of the public health, including the power to take possession of and occupy as a hospital any building or buildings in the city, as it may in good faith declare the public safety and health to demand, and the mayor shall in ivriting approve. * # * Such peril shall not be deemed to exist except when and for such period of time as the board of health and mayor shall declare. * * # ” (Italics supplied.)
We come now to the resolutions of the Board of Health dated respectively, January 29, 1965 and March 31, 1968. Both resolutions are in evidence here marked Exhibit “A ”, attached to respondents’ answer. Comparison of these two resolutions discloses that they are identical except for the addition in paragraph 2(a) of the latter, of the words “ cold and/or hot” referring to water.
As amended, the said resolution reads as follows:
BOARD OF HEALTH
Resolution of the Board of Health of the Department of Health of The City of New York
Resolved, That the resolution adopted by the Board of Health on the twenty-ninth day of January, nineteen hundred sixty-five, declaring certain circumstances and conditions in dwellings to be dangerous to life and health and a public nuisance, be and the same hereby is amended, to read as follows:
Whereas, The Board of Health has taken and filed among its records reports that there are dwellings in New York City which are deteriorated and
*62 1. Which (a) have been seriously neglected by the owner or (b) have a history of repeated violations of the New Torlc City Health Code or the Multiple Dwelling Law and/or other laws, statutes, ordinances or regulations relating to housing maintenance, and
2. Which (a) have no running cold and/or hot water or (b) have no effective sewage disposal facilities or (c) have no electricity or (d) have no heat following a history of repeated violations of the heating requirements of the New York City Health Code or of other applicable laws, statutes, ordinances or regulations or (e) which have no heat because the boiler, furnace or distribution facilities thereof are so defective as to render the heating system inoperative or (f) contain other conditions which, in the opinion of the Department of Health, present an immediate danger to the life and health of the occupants thereof or the occupants of adjacent buildings, and
Whereas, Such reports indicate that such dwellings are located in numerous areas throughout the City, and
Whereas, The Board of Health regards the aforesaid reports as sufficient proof to authorize the declaration that such dwellings by reason of any of the circumstances specified in paragraph 1 above or any combination thereof together with any of the conditions specified in paragraph 2 above or any combination thereof are in a condition and in effect dangerous to life and health and constitute a public nuisance, and
Whereas, Personal service or service pursuant to subdivisions a or b of Section 564-21.0 of the Administrative Code of The City of New York of orders requiring the abatement of such nuisance and conditions in effect dangerous to life and health upon each of the persons who, pursuant to the provisions of Chapter 22 of the Administrative Code of The City of New York, has a duty or liability to abate such nuisance and conditions, would result in imminent peril and delay prejudicial to the public health, welfare and safety; now, therefore, be it
Resolved, That the Board of Health is of the opinion that such dwellings are in a condition and in effect dangerous to life and health and constitute a public nuisance and such dwellings be and they hereby are declared in each instance a public nuisance and in a condition and in effect dangerous to life and health; and be it further
Resolved, That all persons who, pursuant to the provisions of Chapter 22 of the Administrative Code of The City of New York and such other chapters, sections, laws or rules as are applicable thereto, have the duty or liability to abate such nuisance and conditions in effect dangerous to life and health, are *63 hereby ordered to abate such nuisance and conditions forthwith by causing running cold and/or hot water, electricity, adequate sewage disposal facilities or heat, as the case may be, to be supplied to such dwellings; and be it further
Resolved, That in the event that such persons or any of them shall fail to to take all necessary steps to comply with this order immediately, the Department of Health be and it is hereby authorized to take forthwith all necessary measures to secure the abatement of said nuisance and conditions in effect dangerous to life and health.
(As adopted by the Board of Health March 21,1968) a5,8 EDWARD O’ROURKE, M.D., Chairman, Board of Health. (Emphasis supplied.)
There can be no question that individually or collectively either lack of hot water, or an inordinate accumulation of garbage or lack of elevator service (whether self-service or manually controlled), are detrimental to health, and, if continued, can become dangerous to human life — that they are nuisances within the meaning of the law (§ 564AL5.0).
Petitioner makes a big thing out of the fact that hot water can be turned on by pushing a button; that garbage cans are provided in front of the buildings and that elevators in most cases are self-service. They insist that if these services were denied it was not because the landlord did not provide them but because some one (presumably the striking personnel) would interfere with them as often as they were restored, and, finally, that ‘ ‘ at the time of the inspection visits to the buildings at which the Emergency Repair Program was later invoked, they (the inspectors) had access to the hot water and elevator facilities, whether by apartment, lobby or otherwise ” (see agreed fact 4) — this last, presumably, to indicate that those services were at all times available.
If it be the fact that the suggested interference did exist, there was nothing to prevent the landlords from taking steps to insure that these particular services were not mischievously interfered with. And as for the alleged garbage accumulations inside the buildings, we look in vain in the record for the suggestion even that this was done by the striking service personnel. The inability or unwillingness of the petitioner to take effective precautions to prevent the alleged interferences is charged to the frailty of padlocks and to the inordinate cost of providing an armed guard to prevent the mischief. These arguments are not impressive and they are rejected.
There can be no question that respondents have the power under the common law and under section 564-18.0 to declare *64 nuisances and to enter upon premises for the purpose of abating a nuisance first declared by the Board of Health, after reasonable notice to the offending party, reasonable time to correct the condition and reasonable opportunity to be heard (§ 564-19.0). And this is clear when either the landlord (whether he creates it or not) or a tenant creating the same, is unwilling or unable to abate the nuisance first declared and of which he has notice or knowledge.
There can be no question that in cases of ‘1 imminent peril to the public health,” the Department of Health may exercise extraordinary powers as specified in section 563 of the New York City Charter (Administrative Code, § 564^19.0) — including the power to take possession of any property in an appropriate situation where it first determines and declares, in good faith, that the public safety and health demands.
There can be no question that section 563 of the New York City Charter refers to the take over of any building — not merely a building in which essential services have been denied entitled tenants —■ and then only in instances of epidemic or widespread disaster character. Does not the expression “including the power to take possession and occupy as a hospital ” in the said section provide a tip-off to the legislative intent!
There can be no question that respondents, under authority of chapter 22 of the code and section 563 of the New York City Charter in an appropriate case, may take possession of an entire dwelling or a number of dwellings in a blighted area where the said dwellings are deteriorated, have been seriously neglected by the owner or have a history of repeated violations, etc. (See resolution, supra). Such conditions are certainly tantamount to an impending disaster.
Nor can there be any question that in an appropriate situation respondents may defray the cost of correcting a condition in the first instance and later look to the landlord and/or the tenant for recoupment either by order or judgment. And in the case of landlords themselves — to “impress” a lien on rents due and owing to the landlord for the use of those premises as a whole or that portion of the premises against which the nuisance is declared, the order relates, and in respect of which such expenses were incurred (§ 564r-22.0).
That these are essential services to which a contracting tenant is entitled and which the landlord is duty bound to provide cannot be challenged. Moreover, it does not require a pronouncement on the part of the Department of Health to conclude that lack of these services is dangerous to health and could be a danger to life.
*65 The Multiple Dwelling Law of the State of New York was enacted in all its sections to provide standards as safeguards for the “ health, safety, morals, welfare, and reasonable comfort of the citizens of the state ” (§ 2). Among the provisions of that statute one finds the following:
§ 51 (subd. 6.) The duty to keep passenger elevators [where required to be maintained] “operative at all times ” and ‘ ‘ accessible to every apartment above the entrance story. ’ ’
§ 75. The duty of the owner to supply hot water.
§ 77. The duty to maintain and repair plumbing and sewage.
§ 78. The duty to-keep and maintain all parts of their buildings in good repair.
§ 80. The duty to keep all parts of their buildings clean and free from vermin, dirt, filth, garbage or other matter dangerous to life or health.
Nevertheless, in the absence of a declaration of imminent peril as provided for in chapter 22 (§ 564-19.0) of the Administrative Code and section 563 of the New York City Charter the Emergency Repair Program may be invoked by respondents only upon such notice as is provided for and upon such safeguards as are indicated in chapter 22 (§§ 564-19.0, 564r-20.0 and 564-21.0).
On this record, in the court’s opinion, respondents’ compliance was hardly substantial.
Had respondents substantially complied with the conditions and safeguards above mentioned and then limited their activities to engaging personnel for each of the buildings affected, but solely for the purpose of restoring hot water and/or elevator service (self or operator controlled) and/or for removal of garbage from the interior of a building and to keep those services constant, this application would have to be denied without prejudice to article 78 proceedings for judicial review of the procedures employed and the reasonableness of the expenses allegedly incurred by respondents, but only after prescribed administrative remedies have been exhausted. (See Matter of Rigg v. Gabel, 37 Misc 2d 1069, affd. 18 A D 2d 796 and the discussion of that authority on page 10 of the memorandum-decision filed by this court in ‘ ‘ Concord ’ ’ [second above-captioned case]).
And, perhaps, although reasonable men could differ, it would make no difference if respondents hired the very people on strike to provide these limited services, provided, of course, that the compensation paid them would be no more than commensurate with the value of the specified limited services rendered by them.
Respondents chose to do much more — they hired the striking personnel to perform all services performed by them prior to *66 the labor dispute (most of which have minimal relation to health and safety) and, admittedly, paid or promised to pay them $18 per week more than they were earning prior to the strike (precisely the first year’s salary increase amount demanded by them in their negotiations with the landlords and up to this moment denied them by the landlords at the bargaining table).
Nothing quoted above from chapter 22 of the Administrative Code of the City of New York or the New York City Charter can be tortured to justify the extent to which respondents have acted here. Moreover, the resolutions of the Board of Health, hereinabove referred to, are wholly inapplicable to the conditions here obtaining. There is no showing that these buildings are deteriorated; that they have been seriously neglected by the owners or that they have a history of repeated violations. These resolutions are of ‘ ‘ ancient vintage ’ ’ clearly applicable only to ‘ ‘ slumlords, ’ ’ blighted buildings and blighted areas.
In the court’s opinion this was an unauthorized and unwarranted taking of possession of private property and an unauthorized and unwarranted interference in a lawful labor dispute, however well motivated and regardless of any inconvenience to a segment of the general public in Bronx County.
Whether so intended or not, it has the effect of destroying the economic counterbalance which both parties to the collective bargaining process have a right to enjoy without outside interference.
To repeat what was said by this court in “ Concord,” the second above-captioned matter (see memorandum opinion N. Y. L. J., Oct. 6,1970, p. 19, col. 3): “ unless a strike is illegal (which is not the case here) or the City of New York is otherwise acting under clear statutory mandates, the City of New York has no power or right to use its ‘ muscle ’ in any manner calculated to bring about the capitulation of one side to the demands of the other ”.
On this record there is no persuasive proof that the situation requires a resolution of the Department of Health declaring the presence of great and imminent peril to the public health and no persuasive proof that they have in fact adopted any such. Wh.eth.er, under these facts it has the power to adopt such a resolution and to order taking possession of specific buildings is debatable. Assuming but not deciding however, that it has such power in these circumstances, it is clear that unless respondents comply with the procedures carefully spelled out in section 563 of the New York City Charter the drastic actions taken by respondents must be ruled arbitrary and capricious.
*67 Youngstown Co. v. Sawyer (343 U. S. 579) is analogous. By that historic decision the President of the United States was ultimately prevented from “ seizing ” the steel mills during the Korean “ police action ” simply because there was no Congressional authorization for the “ take over ”, albeit with Youngstown’s management and other personnel acting as employees of the Government.
Paraphrasing Mr. Justice Black (p. 585, supra) seizure and governmental operation of these buildings are bound to result in many present and future damages of such nature as to be difficult if not incapable of measurement. The Department of Health’s power to issue an order must stem from local law of the City Council under legislative authority.
There is no legislative authority or local law that expressly authorizes respondents to take possession of property as they did in these circumstances.
The application is granted in all respects consistent with the foregoing conclusions.